UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

01 OCT -9  AM 8: 34

DISTRICT COURT
N. D. OF ALABAMA

| | | |
|---|---|---|
| KENNETH WIGLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 00-BU-3584-M |
| | ) | |
| DEKALB COUNTY COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

OCT 0 9 2001

## MEMORANDUM OPINION

Plaintiff Kenneth Wigley filed this action against Defendant DeKalb County Commission alleging that he was terminated in retaliation for exercising his First Amendment rights and that he was denied due process, in violation of the Fourteenth Amendment, because of bias of some of the Commissioners on the panel reviewing his termination.   Defendant filed a motion for summary judgment (Doc. 18, as amended, Doc. 22) Based on the Court's review of the record, the Court finds no disputed issues of material fact and that Defendant is entitled to judgment as a matter of law on Plaintiff's claims.

## I.    **SUMMARY JUDGMENT STANDARD**

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106

30

S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553;  *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994).  In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II.   **STATEMENT OF FACTS**

In 1992, DeKalb County hired Plaintiff Kenneth Wigley as a heavy equipment mechanic in the Road Department.  Within one year, Wigley was promoted to Shop Supervisor.  As Shop Supervisor, Wigley's duties included working as a mechanic, ordering parts for the department, and supervising other mechanics in the shop.

Plaintiff was hired into the Road Department by Ed Nix.  According to Nix, Plaintiff is the best mechanic in the northeast region of Alabama.  Furthermore, Nix never had any complaints or problems with Plaintiff during the time he was Plaintiff's supervisor, and he found Plaintiff to be very cooperative.  Jim Gaddy, the County Engineer since May 1998, also had the opportunity to witness Plaintiff's work on a daily basis, and he felt that Plaintiff did an excellent job.  Gaddy testified that, in his tenure, he never had any performance concerns with Plaintiff and that Plaintiff performed both an excellent quality and quantity of work.

Soon after beginning their terms in December 1998, the DeKalb County Commissioners began discussions regarding the feasibility of creating an overall parts department for the county in order to monitor and control the purchase and use of parts for the maintenance and repair of county vehicles and equipment.  In June and July 1999, after much discussion, the Commission deemed it wise to create the Parts Department and authorized the County Administrator to formulate the job description and properly advertise two new positions: (1) Equipment Maintenance and Parts Superintendent, and (2) Assistant to the Equipment

Maintenance and Parts Superintendent. The idea behind the creation of the new positions was to try and get a tracking record of parts and supplies in the Road Department and to run a central County Parts Department.

Also during this time, Plaintiff filed two complaints with the Alabama Ethics Commission: one alleging wrongdoing by Commissioner David Harris and one alleging wrongdoing by Commissioner Ricky Harcrow.

On June 9, 1999, Wigley filed an ethics complaint naming Commissioner Harris as the respondent. The basis of the complaint was Plaintiff's allegation that County employees were spreading chert and installing pipe on private property. The Complaint alleged that Commissioner Harris had ordered road work on a private road. However, evidence was submitted that the County had performed such work since at least 1987, more than 10 years before Harris took office. The ethics complaint was closed on January 7, 2000, "due to lack of sufficient evidence to warrant further investigation." Doc. 24, Exh. J.

On June 11, 1999, Wigley filed a complaint with the Ethics Commission naming Commissioner Harcrow as the respondent. This complaint alleged that Harcrow had directed County employees to remove stumps from private property. Doc. 24, Exh. K. Bennie O'Shields, the foreman on the crew that allegedly performed the work on private property, told Plaintiff that his allegations were untrue. He told Plaintiff that the crew had not done work on private property and that Harcrow had not ordered them to do work on private property. Plaintiff told

O'Shields that he would file the complaint anyway.   While the complaint was pending before the Ethics Commission, Plaintiff asked O'Shields to sign a statement saying that he performed the illegal work.

The Ethics Commission closed the complaint because:

There was a lack of sufficient evidence to warrant further investigation in this case.  Evidence was provided by the owners of the property in question that they used their private bulldozer to push the stumps and trees back away from the easement and they had cut the trees in the easement.  No other eye witnesses were provided.

Doc. 24, Exh. K.

Prior to filing the complaints, Plaintiff met with Charles Bell, Chairman of the County Commission, and Steve Ballard, the County Administrator, to address his concerns.  Plaintiff also discussed his concerns with Gaddy during the Spring or Summer of 1999. At Gaddy's direction, Plaintiff and Ted Howard, DeKalb County Road Superintendent, took the pictures of what Plaintiff alleged to be misuse of county resources.  On June 18, 1999, Gaddy, based on Plaintiff and Howard's statements and photographs, as well as his own observations, wrote a letter to Bell, the County Attorney, and the District Attorney, asking them to look into the allegations.  The County Attorney responded, stating that no work should be done outside of the County's right-of-way.

On July 22, 1999, Plaintiff filed a third complaint with the Ethics Commission, alleging violations of the whistle blower provisions of the Alabama Ethics Law by the County Commission.  Doc. 24, Exh. M.  In this complaint, Plaintiff alleged that the

County Commission was "conspiring to punish [him] for filing ethics charges." *Id.* He alleged that the Commission had posted his job description; the posting was for the newly-created position of Equipment Maintenance and Parts Superintendent.

At the July Commission meeting, Commissioner Harris addressed Plaintiff in an angry tone. He also asked Gaddy why he had employees making pictures throughout the County. Gaddy testified that following this meeting he was concerned that his job and Plaintiff's job were in jeopardy. At this same meeting, shortly following Harris's comments, the County Commission voted to re-apportion Wigley's county vehicle. Gaddy felt that the reassignment of Plaintiff's truck was in retaliation for the filing of the Ethics Complaints. Two days after the meeting, the Commission posted a listing for a new position of Equipment Maintenance and Parts Superintendent.[1] The description of this position included many of the duties that were at the time performed by Wigley. Although Gaddy testified that no one had discussed the position with him prior to the July Commission meeting, the record shows that Gaddy was present at the June 22, 1999 Commission meeting where such a position was discussed and approved. *See* Doc. 24, Exh. F.

The complaint regarding the posting of a new position was closed on March 8, 2000 after the Ethics Commission had made several unsuccessful attempts to reach Plaintiff. Several months later on August 12, 2000, Plaintiff wrote the Ethics

---

[1]The creation of this position was authorized at the Commission meeting on June 22, 1999. Doc. 24, Exh. F.

Commission.  In this letter, Plaintiff alleged that he had been trying to reach the Ethics Commission and that he had been terminated by the County.  He stated that he wanted to file a complaint against the County Commission based on his termination and that he wanted the Ethics Commission to review the transcript of his post-deprivation hearing. Approximately ten days later, the Ethics Commission responded with a letter that stated that Plaintiff's termination did not appear to have been based on his complaints.  Plaintiff did not pursue the matter.

In August 1999, the County hired Tim Bates as the Equipment Maintenance and Parts Superintendent and Bobby O'Connor as his assistant.  After the job description had been posted, Harris had spoken with Bates about the job.  Harris and Bates had known each other for a long time and Bates had done work for Harris in the past.  Bates was interviewed for the position by the County Commission and was ultimately hired.  Once Bates was hired, Plaintiff did not order parts or sign requisitions.

Several months later, Plaintiff's supervisor, Ted Howard, the Road Superintendent, resigned.  Howard testified at Plaintiff's post-deprivation hearing that during this time, Bell, Harcrow and County Commissioner Wayne Graves "were quite intent on relieving Mr. Wigley of his position."   Doc. 28, Exh. G, p. 153. According to Howard, these Commissioners did not have any job-related reason for wanting to terminate Plaintiff; "[t]hey just didn't like his attitude." *Id.* at 156.  Howard ultimately turned in his resignation in October of 1999; he was motivated to resign

because he felt pressure from the Commission to terminate Plaintiff.

Prior to Howard leaving his position, he met with Harris, Gaddy, and Plaintiff in Plaintiff's office and offered to leave Plaintiff alone if Plaintiff would sign an affidavit stating that the charges he had filed with the Ethics Commission were false.[2]  Plaintiff refused to withdraw his charges.  Then, Harris told Howard that "he didn't think that [Plaintiff] was the man to be running the job at the shop, that he really didn't think he had the personality, the attitude to do the job."  Doc. 28, Exh. G, p. 158.

In December 1999, the Commission voted to broaden Bates's job duties to include supervision of the Road Department Shop.  A memorandum was sent to all shop employees on January 4, 2000.   This memorandum stated that the Commission had placed Bates "over all equipment and related maintenance activities for the county including all personnel within the Road Department, which are commonly known as Shop Personnel."  Doc. 24, Exh. Q.  The memorandum also stated, "All effected personnel should coordinate all maintenance activities and any personnel related matters [with] Mr. Bates."  Id.

Prior to being placed over the shop, Bates had had no interaction with Plaintiff.  When he assumed these responsibilities, Bates did not personally inform Plaintiff that he was in charge of the day-to-day operation of the shop. Furthermore,

---

[2]Harris testified that he asked Plaintiff, "Would you be willing to write the ethics [commission] and drop these ridiculous charges?"  Doc. 28, Exh. F, p. 66.

Bates did not inform Plaintiff what to do on a daily basis, nor did he inform Plaintiff that he should not direct the daily operations of the shop.

On March 1, 2000, Bates called Plaintiff into his office, handed him a list of various items for which Bates had written him up, and told him that he was terminated immediately.[3]  The list presented to Plaintiff contained twelve items, all of which dealt with Plaintiff's failure to communicate to Bates where he was or what he was working on, Plaintiff's failure to fill out work orders in a timely fashion, Plaintiff's directing of employees' daily activities, and his use of vulgarities.  The letter stated:

> This notice is given to you as a part of a pre-deprivation hearing.  The following are alleged violations of the DeKalb County Personnel manual, which have come to my attention, and to which I am giving you an opportunity at this time to respond.
>
> 1.      On January 4, 2000, you left work at 11:15 a.m. for lunch and returned at 12:25.  While you have a 30 minute lunch break, you were gone for 1 hour and 10 minutes.  No time was taken off of your time sheet to compensate for the 35 additional minutes you took for your lunch break.
>
> . . .
>
> 2.      January 25, 2000, you were leaving to work on equipment after being told that no work was to be done without a work order.  You informed your supervisor that if he wanted you to use a work order he could bring one to you.

---

[3]Bates contends that he gave the list to Plaintiff and offered Plaintiff the opportunity to respond to each item.  Plaintiff, according to Bates, refused to discuss the list and said that he was going to turn it over to his lawyer.

. . .

3.    On January 28, 2000, while being instructed as to the paper work that [was] to be used in order to track all work done, you indicated to your superior, Tim Bates, that you would not comply with department rules and regulations on paper work. You began to use foul language and left the meeting, which was a departmental meeting, prior to the time that said meeting adjourned.

. . .

4.    On February 7, 2000, you were informed by your superior, Tim Bates that Stan Harper would be reassigned to the brake shop. In violation of that order, you directed Stan not [to] report to the brake shop.

. . .

5.    On February 9, [2000,] Stan Harper had been moved to the brake shop. You came to the brake shop on February 10, 2000, and took Stan from his job at that time in violation of a directive from your superior.    That action severely impacted the ability of the maintenance department to service the Sheriff's vehicles.

. . .

[6.]    On February 11, 2000, Stan Harper had been ordered by your superior, Tim Bates, to report to the shop. You countermanded that order and informed Mr. Harper that you would find him work in the field in order to keep him out of the shop where he had been ordered to be by your superior.

. . .

[7.]    Also, on February 11, 2000, Mr. Harper had been assigned [by Tim Bates] to repair the brakes on the Sheriff's car driven by Dale Orr . . . .  While your superior was elsewhere, you went to the shop, got Stanley Harper, and took him off of the job he was assigned.

. . .

[8.]   On February 15, 2000, in violation of department rules, you repaired truck #9570 without first obtaining the appropriate paper work, or going through the appropriate procedures to obtain replacement parts.

. . .

[9]   On February 17, 2000, you left the job at 9:55 and did not return until 11:15.

. . .

[10.]   On February 18, 2000, you called Truck Pro and cursed Tim Floyd, a supplier of parts to the maintenance department.

[11.]   On February 18, 2000, you cursed another employee of Truck Pro, and threatened that if he came back to your shop you would kill him.

[12.]   On February 25, 2000, you did not report to work at any time during the day, nor did you call in as required.

Doc. 24, Exh. T.

Bates testified that he had written up Plaintiff for each of these twelve items over a two month period, but he had not shared these write-ups with Plaintiff. Bates never looked at Plaintiff's performance evaluations or discipline records prior to making the decision to terminate him. Before he was terminated, Plaintiff did not believe that he had any trouble with Bates.

Plaintiff contends that every item on the list is false. However, the record, viewed in the light most favorable to Plaintiff, indicates that the following incidents occurred:

**ITEMS 1 & 9**:   With regard to the incidents when Plaintiff was allegedly

absent from work on January 4, 2000, and February 17, 2000, Plaintiff testified that

he did not tell Bates he was leaving or where he was going because Bates did know

what he was doing.  Plaintiff testified at his post-deprivation hearing as follows:

> Q.    What about these occasions when you say that you were doing
> different things when you were going, when you would leave, did you
> ever report to Mr. Bates that you were leaving?
>
> A.    Never had to.
>
> Q.    Did you think you should?
>
> A.    No, ma'am.  My job is to go check the equipment and fix it.  If
> there is any problem with that, I notify him.
>
> Q.    Did you not think it was your supervisor who should have known
> where you were?
>
> A.    Not if he [doesn't] know what he's doing.
>
> Q.    Excuse me?
>
> A.    Not if he [doesn't] know what he's doing.  What good is telling
> anybody you're going to do something when he [doesn't] know what
> you're talking about.

Doc. 28, Exh. G, pp. 93-94.  It is undisputed that Plaintiff was away from the shop

at the times and dates shown in the letter.  Moreover, it is undisputed that Plaintiff

did not tell Bates he was leaving or where he was going.  Indeed, Plaintiff admits

that he did not tell Bates what he was doing because Bates did not know what he

was talking about.

   **ITEM 7**:    Plaintiff testified that he had taken Harper to work on equipment

in the field on the day Harper was to repair the brakes on the Sheriff's car.  He

testified that there were no parts for the brake job and that he had taken Harper with

him.  After they finished working in the field, Harper returned to the shop and

completed the brake job, staying about 30 minutes overtime.  Plaintiff testified that

he did not violate Bates's order to Harper because "Stan Harper still worked for me."

Doc. 28, Exh. G, p. 96.  On February 11, 2000, Bates was Plaintiff's supervisor;

Plaintiff specifically ignored and countermanded Bates's instructions to Harper.

Harper did not work for Plaintiff; Plaintiff and Harper worked for Bates.

**ITEM 8**:    Plaintiff testified that he repaired truck # 9570 without a work

order.  This repair allegedly did not require a work order, Plaintiff explained,

because no new parts were required and he had used an old part.  Doc. 28, Exh.

A, pp. 80-81.  Despite Plaintiff's testimony that such paper work, if required at all,

would have unnecessarily delayed his repair of the truck, it is undisputed that he did

not have a "the appropriate paper work" or that he did not attempt to obtain such

paper work.

**ITEM 10**:    Plaintiff testified that he did tell Tim Floyd of Truck Pro, when

Floyd would not give him prices on oil filters, that his refusal was "bullshit."  Plaintiff

believed that the Truck Pro prices were higher than a local supplier and he was

aggravated.  Bates was in charge of getting prices on supplies, but when asked why

he had called Truck Pro to check prices, Plaintiff testified, "That was always my job

before they [gave] it to Mr. Bates, just habit I guess.  Trying to save the taxpayers'

money." *Id.* at 83. He admits to using profanity when talking with Floyd; he denies ever cursing any other employee of Truck Pro.

**ITEM 12**:   Plaintiff admits that he was absent from work on February 25, 2000 and that he did not call in. However, Plaintiff testified that he had told Tommy Broyles, the Road Superintendent, the day before that "if [he] wasn't feeling better, I wouldn't be there." *Id.* at 85-86. Plaintiff did not work on February 25, 2000, but he did go to the office and pick up his check. He did not call his supervisor, Bates, and he did not feel it was necessary to tell him that he was not going to be at work.

After his termination, Plaintiff was given a post-deprivation hearing before the Commission. Prior to his post-deprivation hearing, William Scruggs, Plaintiff's attorney at the time, requested that Commissioners Harris and Graves not be allowed to sit on the panel to hear his appeal. Plaintiff contends that prior to Howard's testimony at his post-deprivation hearing that he did was not aware of any other commissioners involved in the "conspiracy" to terminate him. Doc. 28, Exh. A, p. 106. However, in the same letter in which Scruggs requested that Harris and Graves not sit on the panel, Scruggs stated, [A] member of the commission, possibly the Chairman, Mr. Bell, told Mr. Howard that he would get a raise if he stayed and got rid of Kenneth Wigley." [4] *Id.* Exh. K. Ricky Harcrow, a County

---

[4]Although there is evidence that Harris and possibly Bell tried to convince Howard to terminate Plaintiff, there is no evidence that these men tried to convince Bates to terminate Plaintiff.

Commissioner who sat on the panel that heard Plaintiff's post deprivation hearing admits, that prior to that hearing, Bell had spoken to him about Plaintiff creating problems in the Road Department. Commissioner Ronnie Osborn, who also sat on the panel for Plaintiff's post deprivation hearing, testified that the Commission as a whole discussed Plaintiff's job performance. Osborn also remembers Harris expressing anger, frustration, or concern about Plaintiff to the other Commissioners. Furthermore, Harris testified that he and the other Commissioners voted to terminate Plaintiff prior to the post deprivation hearing, although he has submitted an affidavit that his deposition testimony was mistaken and that no vote to terminate Plaintiff occurred prior to the post-deprivation hearing.

Harris and Graves did not participate in the post-deprivation hearing. No objection to Commissioner Harcrow, Bell, and/or Osborn sitting on the review panel was made at the hearing, before or after Howard's testimony.

The DeKalb County Personnel Policy Manual sets forth the following policy regarding discipline:

> (XXVIII)    DISCIPLINE ACTION
>
> PURPOSE. It shall be the duty of all County employees to comply with, and to assist in effectuating the provisions of this employee Handbook. The primary purpose of discipline shall be to correct employee's performance and behavior. No employee shall be disciplined except for violation of established rules and regulations. All discipline shall be fair, prompt and certain. Every effort shall be made to determine why the employee failed to observe proper conduct.

Doc. 28, Exh. D, p. 17.   Bates testified that he is familiar with the DeKalb County

Personnel Manual, but admits to having no understanding of the concept of progressive discipline.

Osborn testified that the primary purpose of discipline is to correct performance. In order to accomplish this purpose a supervisor should take action to communicate a performance concern immediately after the occurrence of the act that requires discipline. Harris testified that an employee should know when they have been written up and should have an opportunity to sign the statement. Gaddy testified that in his opinion a supervisor following the DeKalb County guidelines should first address a problem orally with an employee, then if necessary write up the employee, and if the problem persists and three write ups occur the employee may be properly terminated.

The Personnel Policy Manual does not proscribe specific disciplinary actions for certain work rule violations. However, work rule violations are divided into two broad categories: "(A) grounds for progressively stronger disciplinary action;" and "(B) grounds for immediate suspension without pay as [a] prelude to dismissal." *Id.* "Absence without authorized leave" is a ground for progressively stronger disciplinary action, while "refusal to obey a lawful order from a superior" is a ground for immediate suspension pending dismissal.

III.   **DISCUSSION**

   A.   **First Amendment – Termination**

Defendant contends that Plaintiff cannot establish his claim that he was

terminated for exercising his First Amendment rights because Plaintiff cannot

establish that his termination was motivated by the exercise of his free speech

rights. Plaintiff argues:

> Here, we have direct evidence that Wigley's speech caused the
> termination of his employment. The testimony of both prior supervisors
> and that of several County Commissioners is that Wigley performed all
> of his job responsibilities well. Furthermore, Commissioner Harris, in
> the presence of Gaddy and Howard, told Wigley that, if he dropped the
> ethics charge against [Harris], [Harris] would leave him alone. The fact
> that Wigley's speech caused his termination is further evidenced by the
> fact that immediately following the Commission meeting where the
> ethics charges were discussed the Commission reacted with two
> retaliatory acts against Wigley: Wigley's truck was reassigned and a
> job [that] included Wigley's responsibilities was posted as vacant.[5]

Doc. 27, p. 17 (footnote added; original footnotes omitted).

The problem the Court finds with Plaintiff's argument and his evidence is that

it does not connect the decision-maker – Bates – with any of his purported evidence

of causation.  The evidence is undisputed that Bates was the decisionmaker.

Moreover, Plaintiff's testimony as a whole does not support his claim that the

allegations of misconduct in the March 2000 letter were false and/or fabricated.

Indeed, much of Plaintiff's testimony, viewed in the light most favorable to Plaintiff,

unmistakably demonstrates that he was defiant to Bates's instructions and did not

recognize Bates's authority. In other words, the evidence is undisputed that Plaintiff

was insubordinate and uncooperative to Bates.  Plaintiff's performance for other

---

[5]The position was posted after the July Commission meeting but it was
created and its posting was planned at the June Commission meeting.

supervisors and their evaluation of his performance is not sufficient to dispute this fact.  The Court finds some sympathy in Plaintiff's predicament and his reactions; nevertheless, there is no evidence that his complaints to the Ethics Commission in June and July of 1999 were a motivating factor in Bates's decision to terminate Plaintiff in March 2000.  *See Mize v. Jefferson City Board of Education*, 93 F.3d 739, 741-46 (11th Cir. 1996).

All the events recounted above as evidence of causation precede Bates becoming Plaintiff's supervisor; all the events relied upon by Bates to justify his decision to terminate Plaintiff occurred after Bates became Plaintiff's supervisor. Plaintiff has failed to submit sufficient evidence that ***Bates's*** decision to terminate Plaintiff was motivated by his complaint to the Ethics Commission.  Moreover, the record evidence is clear that Plaintiff did not respect Bates's authority and did not abide by his orders or instructions.  The allegations of insubordination are not disputed by the record.

Therefore, Defendant's motion for summary judgment as to Plaintiff's First Amendment claim is due to be granted.

### B. DUE PROCESS

Plaintiff contends that he was denied procedural due process because his post-deprivation hearing was not before an impartial decisionmaker.  Specifically, Plaintiff contends that two of the Commissioners that sat on the panel – Harcrow and Bell – "discussed the situation in the shop and discussed that Wigley was a

troublemaker during the time period before the post deprivation hearing." Doc. 27,

p. 19.

In *McKinney v. Pate*, the Eleventh Circuit Court of Appeals set forth the

procedure for challenging bias:

> An allegation of bias may arise in either of two scenarios: in the
> first, the challenger learns of the decisionmaker's alleged bias ***prior to
> or during the proceeding***; in the second, the challenger learns of the
> decisionmaker's alleged bias only ***after the proceeding has
> terminated***. . . . [C]ourts provide distinct procedures that afford the
> challenger an opportunity to address the alleged bias as well as to
> remedy outcomes that are tainted by bias.
>
> In the first scenario, that of the contemporaneously recognized
> bias, courts usually require that the challenger contemporaneously
> object to the bias. Thus, when faced with a supposedly biased
> venireperson in a criminal case, for instance, the defendant must
> object to the biased individual during *voir dire*, either by a challenge for
> cause or by a peremptory strike; if the defendant fails to object to the
> biased individual at this preliminary stage, the objection is deemed
> ***waived***. Similarly, a challenger must object to a biased judge in a
> motion to recuse before trial or as soon as the alleged bias is
> discovered; again, the penalty for failing timely to object is ***waiver*** of
> the objection.
>
> In the second scenario, the alleged bias is discovered after the
> proceeding has concluded; a contemporaneous objection therefore is
> impossible. Due process requires that the challenger have an
> opportunity to object to the alleged bias, and courts consequently have
> instituted procedures to address allegations of bias and to set aside
> bias-tainted outcomes. Typically, courts require that the challenger
> meet a threshold test of demonstrating harm or prejudice resulting from
> the alleged bias before they will reopen a closed case. Absent a
> demonstration of prejudice, the challenger's allegations are discounted.

*McKinney v. Pate*, 20 F.3d 1550, 1562 (11th Cir. 1994)(en banc)(footnotes and

citations omitted, emphasis added), *cert. denied sub nom. McKinney v. Osceola*

Page 19 of 21

*County Bd. of County Com'rs*, 513 U.S. 1110, 115 S. Ct. 898, 130 L. Ed. 2d 783 (1995).

Plaintiff contends that he was unaware of the potential impartiality of Bell and Harcrow until Howard testified *during* his post-deprivation hearing. Therefore, this case falls into the first scenario set forth above, and Plaintiff, to preserve his objection to the impartiality of the proceedings, was required to object *during* said proceeding. However, neither Plaintiff nor his attorney objected *during* the hearing to the alleged bias of Bell and/or Harcrow. Therefore, such objection is deemed waived.[6]

Defendant's motion for summary judgment as to Plaintiff's due process claim is due to be granted.

## IV.   CONCLUSION

Based on the foregoing, the Court finds that Defendant's motion for summary

---

[6]The Court notes that Plaintiff has not attempted to show "harm or prejudice resulting from the alleged bias" under the second scenario set forth in *McKinney*. *See McKinney*, 20, F.3d at 1562.   Rather, Plaintiff argues, "Because the Commissioners failed to disclose both their extra-judicial knowledge relating to the basis claimed to justify Wigley's termination, and the fact that the Commission had voted to terminate Wigley before the post-deprivation hearing, Wigley was denied the opportunity to make an informed judgment as to the impartiality of the panel members.   Since the evidence illustrates the existence of disputed material facts surrounding the impartiality of the persons hearing Wigley's post-deprivation hearing, summary judgment may not be granted as to Wigley's due process claim." Doc. 27, p. 20.   It simply is not sufficient to show a due process violation based on bias simply to argue the existence or potential existence of bias; Plaintiff must show actual harm or prejudice resulting from such bias.

judgment is due to be granted.  There are no disputed issues of fact and Defendant is entitled to judgment as a matter of law.  The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion.

DONE this _____5th_____ day of October, 2001.


_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE